NELSON P. COHEN
United States Attorney

FRANK V. RUSSO
Assistant U.S. Attorney
Federal Building & U.S. Courthouse
222 West Seventh Avenue, #9, Room 253
Anchorage, Alaska  99513-7567
(907) 271-5071
(907) 271-1500 (fax)
Frank.Russo@usdoj.gov

Attorneys for Plaintiff

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ALASKA

| | |
|---|---|
| UNITED STATES OF AMERICA, ) | |
| ) | Case No. 3:06-cr-00061-RRB |
| Plaintiff, ) | |
| ) | |
| v. ) | **UNITED STATES' OPPOSITION** |
| ) | **TO DEFENDANTS' MOTION** |
| JUANITA M. HARRIS, and ) | **TO SUPPRESS** |
| GERALD DREW, ) | |
| ) | |
| Defendants. ) | |
| ) | |

   COMES NOW, the United States of America, by and through undersigned counsel, and hereby opposes the defendant Drew's motion to suppress evidence filed on September 18, 2006, at docket 33, with an accompanying memorandum of law filed at docket 35.   Defendant Harris joined this motion on September 20,

2006, at docket 37, with an accompanying memorandum of law filed at docket 38. Both defendants argue that the search warrant of 10270 Tartan Circle, Anchorage, Alaska, was not supported by probable cause to believe that evidence of a drug crime would be found there. Defendant Drew further argues that, based on the exclusionary rule, the indictment against him should be dismissed and evidence recovered pursuant to a subsequent search warrant, executed some two months later on a 2001 Dodge Durango, also should be suppressed.

The defendants are wrong. As a preliminary matter, defendant Drew has failed to establish that he has standing to contest the search of 10270 Tartan Circle or the 2001 Dodge Durango. Regardless, even if he were to cure this defect, the search warrant for 10270 Tartan Circle was supported by ample probable cause to believe both that defendant Harris lived at that address and that evidence of narcotics trafficking would be found there. That being the case, there is no need to address defendant Drew's exclusionary rule arguments, which are incorrect in any event. Finally, no evidentiary hearing is necessary, as the defendant's requests can be denied as a matter of law from a review of the four corners of the affidavit.

# STATEMENT OF FACTS[1]

In March 2006, the Anchorage Police Department ("APD") Drug Enforcement Unit was conducting an investigation into the drug trafficking of a known suspect. Dorr Aff., p. 4, ¶ 3. APD was utilizing a cooperating source ("CS") that was making controlled purchases. Id., p. 4, ¶¶ 1-3. During a drug purchase in mid-March, Juanita Harris appeared and delivered crack cocaine to the known suspect, who gave the crack to the CS. Id., p. 4, ¶ 3. The CS advised Detective Gordon Dorr that the CS could buy cocaine directly from Harris; Detective Dorr began an investigation of Harris. Id.

On May 3, 2006, the CS arranged to purchase crack cocaine from Harris at a parking lot in Anchorage. Id., p. 5, ¶ 5. Harris arrived driving a 1999 Chevrolet Tahoe, with a small child in a passenger seat. Id., p. 5, ¶ 7. Harris attempted to give the CS powdered cocaine, which the CS refused; Harris offered to get the CS crack cocaine in 15 minutes. Id. Harris drove away, and investigators ultimately followed Harris to a Fred Meyer's parking lot in Anchorage, where the CS made

---

[1] The facts set forth herein are taken from the search warrants and affidavits attached to defendant Drew's motion. In particular, Exhibit C to Drew's motion is the search warrant for 10270 Tartan Circle (the "Tartan Circle residence"), which is supported by the affidavit of Detective Gordon Dorr (the "Dorr Affidavit" or "Dorr Aff."). Exhibit D to Drew's motion is the search warrant for a 2001 Dodge Durango (the "Durango warrant"), which is supported by the affidavit of Task Force Officer Mikell Von Dolteren (the "Von Dolteren affidavit" or the "Von Dolteren Aff.")

contact with the driver of a white Chrysler.[2] <u>Id.</u> The Chrysler was registered to Rental Car Finance Company. <u>Id.</u> After making contact with the driver, Harris drove to meet the CS; the CS joined Harris in the Tahoe, where Harris sold the CS 12.8 grams of crack cocaine. <u>Id.</u>, pp. 5-6, ¶¶ 7-8. After the purchase, at 11:35 pm, Detective Dorr drove to the Tartan Circle residence and noticed the white Chrysler in the driveway, as well as Harris's Tahoe at the curb in front of the residence. <u>Id.</u>, p. 6, ¶ 9. Detective Dorr saw Harris leave the Tartan Circle residence, get into the white Chrysler, and drive to a local grocery store. <u>Id.</u>, p. 6, ¶ 9.

On May 6, 2006, at approximately 7:56 am, Detective Dorr again observed Harris's Tahoe at the curb of the Tartan Circle residence. <u>Id.</u>, p. 7, ¶ 12. Earlier that day, the CS had advised Detective Dorr that Harris, driving the Tahoe, had offered to sell the CS cocaine the previous evening; the CS declined. <u>Id.</u>, p. 7, ¶ 11. Three days later, on May 9, 2006, Detective Dorr drove by the Tartan Circle residence at 11:50 am and observed Harris's Tahoe there. <u>Id.</u>, p. 7, ¶ 13. On May 11, 2006, the CS made another controlled purchase of 15.2 grams of cocaine powder from Harris, who arrived at the meeting location driving her Tahoe. <u>Id.</u>, p. 8, ¶ 17.

On May 13, 2006, at approximately 11:30 pm, Detective Dorr went by the

---

[2] This male was identified as Gerald Drew.

Tartan Circle residence and observed Harris's Tahoe at the residence – this time in the driveway. Id., p. 9, ¶ 19. The very next morning, at 10:43 am, Detective Dorr returned to the Tartan Circle residence and noticed that the Tahoe was still in the driveway. Id., p. 9, ¶ 19. The day after that, on May 15, 2006, at approximately 7:34 am, Detective Dorr returned to the Tartan Circle residence, where he noticed the white Chrysler and a Hyundai that was frequently there. Id., p. 9, ¶ 20. As he was leaving, Detective Dorr spotted Harris's Tahoe pull into the driveway. Id. Later that same evening, at 10:55 pm, Detective Dorr returned to the Tartan Circle residence, where he noticed Harris's Tahoe parked on the curb. Id., p. 9, ¶ 21.

The next morning, May 16, 2006, at approximately 7:03 am, Detective Dorr checked the Tartan Circle residence again and found the Tahoe in the same location as the previous night. Id., p. 9, ¶ 21. Significantly, that same morning at roughly 8:00 am, the CS telephoned Detective Dorr and told him that Harris had called the CS that morning to tell the CS that Harris had cocaine for sale. Id. The very next day, Detective Dorr set up a controlled purchase between the CS and Harris. Id., pp. 9-10, ¶ 22. Harris arrived at the meeting location in her Tahoe at approximately 7:52 pm and sold ½ ounce of cocaine to the CS. Id. Detective Dorr drove to the Tartan Circle residence approximately five hours later and observed Harris's Tahoe parked in front. Id., p. 11, ¶ 23. The next morning, at 7:31 am,

Detective Dorr returned to the Tartan Circle residence and confirmed that Harris's Tahoe was still there.  Id.

As a result of his multiple observations of Harris and/or her vehicle at the Tartan Circle residence, at various times of the day and night over the previous two weeks, Detective Dorr concluded that Harris was staying at the Tartan Circle residence.  Id., p. 4.  He applied for a state search warrant for the Tartan Circle residence, as well as Harris's Tahoe, for evidence of narcotics crimes.  He prepared an affidavit fully setting forth his investigation, including the criminal record and motivations of the CS.  Id., p. 4, ¶ 1.  He also set forth his significant training and nine-years experience in investigating drug crime.  Id., pp. 1-4, ¶¶ 1-12.  In Detective Dorr's experience, people involved in narcotics trafficking retain documentary evidence of these activities, and frequently keep these documents in their residences.  Id., p. 3, ¶ 10.  In addition, in Detective Dorr's training and experience, narcotics traffickers keep firearms, money and stolen property in their residences.  Id., p. 3, ¶ 11.  Finally, Detective Dorr attached a list of items that, in his training and experience, are found in residences and vehicles of drug traffickers.  Id., p. 3, ¶ 12.  These items include controlled substances, paraphernalia, cellular telephones, documents, firearms, and drug proceeds.  Id., p.

12.

Detective Dorr presented his affidavit to State of Alaska District Court Judge Alex Swiderski on May 17, 2006 – the same day as his last observation detailed above and one day after the last cocaine purchase from Harris. Id., p. 11. Judge Swiderski signed the warrant and authorized the search of the Tartan Circle residence as well as Harris's Tahoe. Id.; see Search Warrant, attached hereto as Exhibit A. The warrant was executed on May 18, 2006. Detective Dorr's belief that Harris stayed at the Tartan Circle address turned out to be correct, as she was found in the master bedroom in lingerie. See Exhibit A to defendant Harris's memorandum of law. Also consistent with Detective Dorr's training and experience, investigators found cocaine, paperwork, money, and six firearms in the residence. See Indictment.

On July 27, 2006, defendant Drew was arrested inside a Fred Meyer store in Anchorage on an arrest warrant stemming from the indictment in this case. Von Dolteren Aff. ¶ 13. Incident to arrest, investigators recovered a quantity of crack cocaine consistent with distribution. Id. ¶¶ 13-14. Drew had keys to a Dodge Durango in his pocket. Id. ¶ 13. The vehicle was located and driven back to the Drug Enforcement Administration pending application for a search warrant. Id. ¶ 15. The APD officer who drove the vehicle back to the DEA noted a strong odor

of smoked marijuana.  Id. ¶ 16.  Detective Von Dolteren applied for a federal search warrant, which was signed by Magistrate Judge Philip M. Pallenberg.  An additional firearm was recovered in the vehicle.

STANDING TO CHALLENGE SEARCH WARRANTS

Initially, the Court must address whether the defendants have legitimate expectations of privacy in the places targeted by the search warrants.  Minnesota v. Carter, 525 U.S. 83 (1998).   A defendant bears the burden of demonstrating that he or she has a reasonable expectation of privacy in the places searched.  Rawlings v. Kentucky, 448 U.S. 98, 104 (1980); United States v. Lingenfelter, 997 F.2d 632, 636 (9th Cir. 1993).   The defendant is not "entitled to rely on the government's allegations in the pleadings, or positions the government has taken in the case, to establish standing."  United States v. Zermeno, 66 F.3d 1058, 1062 (9th Cir. 1995) (citing United States v. Singleton, 987 F.2d 1444, 1449 (9th Cir. 1993)).

Defendant Drew has wholly failed to meet his burden.  Thus, the Court should not entertain his motion absent proof that he has a legitimate expectation of privacy in the places searched.  With respect to defendant Harris, the United States agrees that she has standing based on her sworn affidavit alleging she was an overnight guest at the Tartan Circle residence.  See Minnesota v. Olson, 495 U.S. 91 (1990).

ARGUMENT

I.   THE WARRANT FOR THE TARTAN CIRCLE RESIDENCE WAS SUPPORTED BY ABUNDANT PROBABLE CAUSE.

Based on the Dorr Affidavit, the totality of circumstances supported a finding of probable cause that the Tartan Circle residence contained evidence of drug trafficking crimes.[3]  Illinois v. Gates, 462 U.S. 213, 239 (1983).  To satisfy the standard set forth in Gates, the Ninth Circuit has stated:

> For probable cause to exist, a magistrate need not determine that the evidence sought is in fact on the premises to be searched, or that the evidence is more likely than not to be found where the search takes place.  The magistrate need only conclude that it would be reasonable to seek the evidence in the place indicated in the affidavit.

United States v. Peacock, 761 F.2d 1313, 1315 (9th Cir. 1985) (citations omitted), overruled on other grounds sub. nom, Gomez v. United States, 490 U.S. 858 (1989); see also United States v. Jackson, 756 F.2d 703, 705 (9th Cir. 1985) (direct evidence that contraband or evidence is at a particular location is not essential to establish probable cause to search the location).

Instead, a magistrate may draw reasonable inferences about where evidence is likely to be kept, based on the nature of the evidence and the type of offense alleged. See, e.g., United States v. Garza, 980 F.2d 546, 551 (9th Cir. 1992);

---

[3]  The judge who reviewed the warrant was applying the "Aguilar - Spinelli" test of probable cause, which is the standard under Alaska law not federal law.  See United States v. Cormier, 220 F.3d 1103, 1111 (9th Cir.2000) (applying federal protections in federal cases).

United States v. Terry, 911 F.2d 272, 275 (9th Cir. 1990) (citing United States, Angulo-Lopez, 791 F.2d 1394, 1399 (9th Cir. 1986)).  In Terry, the Ninth Circuit noted that "a magistrate may rely on the conclusions of experienced law enforcement officers regarding where evidence of a crime is likely to be found," (911 F.2d at 275), and concluded that the requesting agent's statement that he knew from "past experience that methamphetamine drug traffickers keep drugs, paraphernalia, records, and money in their homes or adjoining structures," combined with personal knowledge of the defendant's earlier possession of methamphetamine, was sufficient to establish probable cause for a warrant to search the residence.  Id. at 275-76.

  The defendants' motion is premised on the fact that Detective Dorr made an insufficient showing in his affidavit that defendant Harris resided at the Tartan Circle residence.  To reach this conclusion, the defendants necessarily ignore the practicalities of investigating narcotics traffickers as well as divorce themselves from common sense.   For example, defendant Drew claims that "[n]o documentation concerning electric bills, rent receipts, ownership of the property or any other evidence suggests that 10270 Tartan Circle was the residence of J. Harris."  Defendant's Memorandum in Support, p. 5.  This ignores the fact that it is common knowledge that narcotics traffickers frequently use fictitious names,

nominees for assets, or take other measures to evade law enforcement scrutiny. See, e.g., United States v. Marin-Buitrago, 734 F.2d 889, 895 (2d Cir. 1984) ("Narcotics traffickers commonly use aliases and use false identification."). United States v. Washington, 852 F.2d 803, 804 n. 2 (4th Cir. 1987) (same). Accordingly, simply finding out whose name is on paperwork pertaining to a residence is insufficient to determine who lives there.

Instead, investigators must undertake time-consuming surveillance, which is exactly what Detective Dorr did. Ideally, surveillance could follow the traffickers back to their house immediately after transactions. However, in some cases, such as the case at bar, such tactics are impracticable. As set forth in the Dorr Affidavit, the Tartan Circle residence is in a cul de sac, making surveillance difficult. Dorr Aff. p. 9, ¶¶ 19, 20. Common sense dictates that if Detective Dorr followed Harris back into her a cul de sac after a drug transaction, there would be great risk of exposure, as there is no means of egress in a cul de sac.

Despite the operational difficulties inherent in surveilling Harris and discovering her residence, Detective Dorr was successful in discovering where Harris lived. He drove by the Tartan Circle residence at all hours of the day and night, finding Harris's vehicle or Harris herself there. On ten occasions during the two-week investigation, at various times of day and night, Detective Dorr made

observations that connected Harris and the Tartan Circle residence.  See Dorr Aff. pp. 5-11, ¶ 9 [Harris observed coming from the residence on May 3 at 11:35 pm]; ¶ 12 [Harris's vehicle in front of the residence on May 6 at 7:56 pm]; ¶ 13 [Harris's vehicle at residence on May 9 at 11:50 am]; ¶ 19 [Harris's vehicle in the driveway of the residence on May 13 at 11:30pm, as well as May 14 at 10:43 am]; ¶ 20 [Harris's vehicle arrived in the driveway on May 15 at 7:34 am]; ¶ 21 [Harris's vehicle parked in front of the residence on May 15 at 10:55 pm, as well as May 16 at 7:03 am]; ¶ 23 [Harris's vehicle parked in front of the residence on May 17 at 1:10 am and 7:31 am].  Two of Detective Dorr's observations of Harris's vehicle occurred just hours after drug transactions between the CS and Harris, which took place in that same vehicle.  Dorr Aff., p. 6, ¶ 9; p. 11, ¶ 23.  Significantly, on one morning, Detective Dorr observed Harris's vehicle at the Tartan Circle residence contemporaneous with a call between Harris and the CS in which Harris told the CS that Harris had cocaine for sale.  Dorr Aff. P. 9, ¶ 21.  These observations led Detective Dorr, to the following inescapable conclusions: (1) Harris was involved in narcotics trafficking and had a stash of readily available cocaine; (2) Harris was staying at the Tartan Circle address; and (3) both before and after drug transactions, Harris was at the Tartan Circle residence.

   Based on these surveillance observations, Detective Dorr was justified in

believing that Harris lived at the Tartan Circle residence and that evidence of drug trafficking could be found there.  See United States v. Gil, 58 F.3d 1414, 1419 (9th Cir. 1995) (concluding that affidavit in which "surveillance observations ... provided a sufficient basis for the judge to infer that the defendants lived at the residences ... and that they were involved in the drug trade" established probable cause).  The surveillance activities, together with the extensive experience of Detective Dorr in drug investigations, indicated that Harris would keep documents, firearms, controlled substances, and other evidence at the Tartan Circle residence.  Detective Dorr detailed his experience in finding evidence in drug traffickers' residences in three paragraphs of his affidavit.  Dorr Aff., pp. 3-4, ¶¶ 10-12.  Judge Swiderski was entitled to rely upon Detective Dorr's expertise in this area, as well as the judge's own reasonable inferences based upon where evidence is likely to be kept.  See Garza, 980 F2d. at 551; Terry, 911 F.2d at 275.

At the very least, Detective Dorr was entitled to rely in good faith upon the issuing judge's determination of probable cause , as it cannot be said that the affidavit was "so lacking in indicia of probable cause as to render official belief in its existence entirely unreasonable." United States v. Leon, 468 U.S. 897, 923 (1984).  Defendant Drew analogizes the facts of the instant case to those of United States v. Hove, 848 F.2d 137 (9th Cir. 1988).  However, Hove is completely

inapposite, as there the "affidavit offer[ed] no hint as to why the police wanted to search the residence" nor did the affidavit allege any link between the defendant and the location.  Id. at 139-40.  In contrast, here Detective Dorr both linked the Tartan Circle residence to Harris and set forth why he believed, in his training and experience, that evidence of drug trafficking crimes could be found at the residence.  Similarly distinguishable is defendant Harris's reliance upon United States v. Weber, 923 F.2d 1338 (9th Cir. 1991).  Unlike the situation here, in the affidavit at issue in Weber there was no evidence, either in the form of prior police investigation or expert opinion, that the defendant had committed the crime at issue over an extended period such that evidence would likely be found at the defendant's residence.  Id. at 1344-46.

Moreover, the defendants have not – and cannot – allege that Detective Dorr somehow misrepresented facts in his affidavit.  Quite the contrary, Detective Dorr fully set forth every fact that was arguably inconsistent with a finding of probable cause.  See, e.g., Dorr Aff., p. 4, ¶ 1 (noting criminal history and possible motives of CS); ¶¶ 11, 21 (noting the fact that the CS's drug-related conversation with the Harris was unrecorded).  Detective Dorr's candor in his affidavit detailing Harris's drug trafficking activity, together with his multiple observations of Harris at the Tartan Circle residence, as well as his experience in drug investigation, defeat any

claim that he did not have a good faith basis to rely upon the judge's finding of probable cause to support the search warrant.

II. DREW'S ATTEMPT TO APPLY THE EXCLUSIONARY RULE TO DISMISS THE INDICTMENT AND SUPPRESS EVIDENCE OBTAINED IN A LATER SEARCH WARRANT FAIL.

Drew argues that the "fruit of the poisonous tree" doctrine mandates dismissal of the indictment and suppression of evidence obtained in a separate warrant, executed some two months later. Although the Court does not need to reach this argument because the search warrant for the Tartan Circle residence was fully supported by probable cause, such arguments are without merit. First, the suggestion that and indictment need be dismissed where evidence is squarely contrary to the Supreme Court's decision in Morrison v. United States 449 U.S. 361 (1981). Morrison held that where evidence has been obtained in violation of the Fourth, Fifth, or Sixth Amendments, "the remedy characteristically imposed is not to dismiss the indictment but to suppress the evidence or order a new trial if the evidence has been wrongfully admitted and the defendant convicted." Id. at 365.

Similarly, "it is well settled that a 'but for' link between illegal police conduct and controverted evidence is not in itself sufficient to dictate suppression." United States v. Jones, 608 F.2d 386 (9th Cir. 1979). Rather, where other events

independent of the arrest contribute to discovery of the contested evidence, such evidence will not be suppressed.  See Wong Sun v. United States, 371 U.S. 471 (1963).  Here, Detective Von Dolteren had a valid arrest warrant for Drew which he was entitled to rely upon in good faith.  Thus, investigators had the right to search Drew incident to his arrest.  When they did, they found crack cocaine consistent with distribution as well as keys to a vehicle that was currently in the parking lot.  Drew admitted that the vehicle contained firearms.  When they impounded the vehicle, an officer smelled marijuana.  Detective Von Dolteren's search warrant relied upon all these facts, which were independent of any of the evidence obtained from the Tartan Circle residence.  Accordingly, Drew's argument that the evidence constitutes "fruit of the poisonous tree" is simply not true.

III.   NO EVIDENTIARY HEARING IS REQUIRED.

Neither defendant has requested an evidentiary hearing, nor is one warranted.  The validity of a search warrant depends upon the sufficiency of what is found within the "four corners" of the underlying affidavit.  United States v. Martinez, 588 F.2d 1227, 1234 (9th Cir.1978); United States v. Castillo, 866 F.2d 1071, 1076 ("Our review is limited to the information contained within the four corners of the underlying affidavit.") citing United States v. Stanert, 762 F.2d 775.

An affidavit is sufficient if it establishes probable cause; that is, if the stated facts would reasonably allow a magistrate to believe that the evidence will be found in the stated location. Martinez, 588 F.2d at 1234. The defendant cannot attack the warrant by calling a witness in an attempt to undermine the statements set forth in the affidavit. Similarly, the government would not be entitled to call a witness to supplement the facts in the affidavit if probable cause were lacking.

Moreover, even in cases where the defendant alleges that a search warrant affidavit contains false statements – an allegation not made here – the defendant must make a threshold showing before a court grants an evidentiary hearing. In such case, a defendant is entitled to an evidentiary hearing on the validity of the affidavit underlying a search warrant only if the defendant can make a substantial preliminary showing that (1) the affidavit contains intentionally or recklessly false statements or misleading omissions, and (2) the affidavit cannot support a finding of probable cause without the allegedly false information. United States v. Reeves, 210 F.3d 1041, 1044 (9th Cir. 2000). Here the defendant has alleged neither. Thus, an evidentiary hearing is unnecessary.

## CONCLUSION

Assuming that both defendant's have legal standing, the search warrant for

the Tartan Circle residence was supported by abundant probable cause supplied by the detailed affidavit of Detective Dorr, who established both that defendant Harris resided at the residence and based on his investigation as well as his training and experience, incriminating evidence likely would be found there.  The judge properly relied upon Detective Dorr's affidavit, as well as common sense, in authorizing the search.  Detective Dorr and other investigators were entitled to rely upon this determination.  Defendant Drew's other arguments regarding the exclusionary rule similarly are without merit.   Finally, the United States submits that no evidentiary hearing is necessary, as the issues raised can be decided from reviewing the search warrants and affidavits annexed hereto.

RESPECTFULLY SUBMITTED this  25th  day of September, 2006 in Anchorage, Alaska.

NELSON P. COHEN
United States Attorney

s/ Frank V. Russo
Assistant U.S. Attorney
Federal Building & U.S. Courthouse
222 West Seventh Avenue, #9, Room 253
Anchorage, Alaska  99513-7567
(907) 271-5071
(907) 271-1500 (fax)
Frank.Russo@usdoj.gov

CERTIFICATE OF SERVICE
I declare under penalty of perjury that a true and correct copy of the foregoing was sent to the following counsel of record on September 25, 2006, via:

    (X) Electronic case filing notice

Kevin McCoy, Esq.
Ronald Offret, Esq.


s/ Frank V. Russo_____